Knight v. The New England Worsted Company.

----

## WILLIAM H. KNIGHT *vs.* THE NEW ENGLAND WORSTED COMPANY.

Parol evidence, though not admissible to add to or vary the terms of a written contract, is admissible to prove facts and circumstances, as to the relations of the parties, and the nature, quality, and condition of the property, which is the subject of the contract; and also the acts of the parties at and subsequent thereto, for the purpose of showing their understanding of its terms.

Where an action of *indebitatus assumpsit* is brought for goods sold under a special agreement, the terms and conditions of which have been complied with, it is immaterial, whether the contract of sale were a single stipulation, disconnected with all others, or a separate and independent stipulation, embraced in the same contract with others.

In an action of *indebitatus assumpsit,* for goods sold and delivered, the plaintiff introduced in evidence a written memorandum, signed by the defendants, from which it appeared, that the defendants were to take the plaintiff's leasehold premises and machinery, at a certain stipulated rent, and upon other terms stated in the mem-

Knight *v.* The New England Worsted Company.

orandum, and the stock therein, consisting of unfinished carpets, yarn, &c., at certain stipulated prices; that the plaintiff should not, during the time of the lease, engage directly or indirectly in the manufacture of any such carpeting as he was then engaged in making; that the defendants should take possession on the 1st of March; and that all carpets in the looms should be taken at the estimate for yarns, adding for scouring, coloring and weaving. The plaintiff also introduced parol evidence to show, that he had mills where he manufactured carpets, and the defendants had mills near his, where they manufactured yarns; that on the 1st of March, 1847, and the following days, two persons on the part of the plaintiff, and two on the part of the defendants, were employed in taking an account of the stock in the plaintiff's mills, and in making a schedule thereof, which, when examined by the defendants' superintendent and found to be correct, was sent to the defendants about the 17th of March; that the defendants, between the 10th and the 17th of March, took possession of the plaintiff's mills, and proceeded to work in two of them, and shut up and locked and took the key of the third; that the superintendent and workmen, who were previously employed by the plaintiff, were employed and paid by the defendants, after they so took possession; that carpets were made in the mills by the defendants, from materials taken by them of the plaintiff, and were sold by the defendants on their own account; that a quantity of wool, included in the schedule, which had been previously purchased by the plaintiff, but had not been removed by him to his mills, was sent to the defendants and used by them; and that on the 20th of March, the two mills which the defendants were so occupying, with some of the stock therein, were destroyed by fire. It was held, that the stipulation on the part of the defendants, to purchase and pay for the stock, &c., was distinct and independent of the performance of the stipulations on the part of the plaintiff, as to the lease, &c.; that, upon taking possession of the premises, and making a schedule of the goods, &c., by the agents of the parties, the defendants became liable to pay therefor, at the prices agreed; that the contract was divisible, so far as performance and the right to recover for non-performance were concerned; and that the plaintiff might recover for such goods, in an action of *indebitatus assumpsit* for goods sold and delivered.

If there be an agreement between two parties, on the one side, to take leasehold premises at a certain rent, and the stock and materials therein at certain agreed prices, and, on the other, to assign the lease by an instrument in writing; and the purchaser voluntarily enter upon the premises, without such assignment, and hold the same without interruption or disturbance; the making of such written assignment cannot then be insisted on as a condition precedent, the performance of which is necessary to entitle the seller to recover payment for the goods.

Where an action was brought to recover for goods sold and delivered, which had been insured by the plaintiff before the alleged sale, and were afterwards destroyed by fire, and the plaintiff's right to recover therein was disputed, on the ground, that a sale of the goods had not been perfected, at the time of the loss, and the defendant having introduced evidence, that shortly after the fire, the parties had agreed to refer the plaintiff's claim for the goods to arbitrators, introduced a paper signed by both parties, which he alleged was an agreed statement of the facts in the case, prepared with a view to the reference, and the plaintiff thereupon introduced evidence to show, that shortly after the loss, the parties had prepared a statement to be laid before the insurers, with a view to claim the amount insured by the plaintiff's policy, it was held, that it was rightly left to the jury to decide, from the evidence before them, whether the statement was prepared with a view to a reference, or for the purpose of the application to the insurers, and also whether it was obtained by the defendants from the plaintiff, by disingenuous means or for any sinister purpose; that if the paper imported all that was contended for by the

defendants, it did not estop the plaintiff to say, that any admission, which it contained, was inadvertently erroneous; and that if any thing therein admitted by the plaintiff was not true, he might so prove unless he had intended to deceive the defendants.

In this action, the plaintiff declared in *indebitatus assumpsit,* against the defendants, to recover the sum of $50,000, for goods sold and delivered, $10,000 for interest, and $3000 for the use and occupation of certain premises; to which were added a count for $43,446·36, being the sum found due to the plaintiff, upon an accounting together of the parties, of and concerning their mutual dealings, and also a count upon the special agreement hereinafter mentioned. The cause was tried before *Metcalf,* J., and was reported by him, for the revision of the whole court, in substance as follows : —

The plaintiff, previous to March, 1847, was in the occupation of certain mills at Saxonville, in Framingham, in this county, which he held under a lease from the city of Boston, for three years from some time in August, 1846, where he was engaged in the manufacture of woollen carpets, and in which he had machinery, and a large stock of wool, yarns and other materials for carrying on his business. The defendants were, at the same time, the occupants of mills below the plaintiff's premises, where they carried on the business of manufacturing yarns.

In February, 1847, a negotiation commenced between the parties, having in view the purchase of the plaintiff's lease and stock by the defendants; and a committee was appointed by the latter, on the 3d of February, to consider the expediency of arranging with the plaintiff for the purchase of his mill, &c., and of undertaking the manufacture of carpets.

This committee made their report on the 8th of February: — " That, in consequence of the carpet manufacturers having become, to a great extent, the spinners of their own yarns, the demand for this company's product of that article has greatly diminished, and the price greatly reduced ; and the company have now a large stock of carpet yarns on hand, with no prospect of a profitable sale ; but, on the contrary, there is a probability of a continually accumulating stock,

unless the company undertake themselves the manufacture of carpets. They therefore recommend, that the company take a transfer of the lease which Mr. Knight now holds from the city of Boston, of the lands, buildings, machinery, &c., at Saxonville; paying therefor, quarterly, as proposed by Mr. Knight, a rent of six thousand dollars per annum, instead of the rate he therein agrees to pay to the city; said transfer being for the remainder of its term, say about two and a half years from this time, and to commence as soon as Mr. Knight has completed his work, and to deliver up the premises to this company in proper order. They recommend, also, that the company purchase, on the best possible terms, of Mr. Knight, such of his wool and other manufacturing materials, as an agent may deem for the interest of this company."

This report was accepted, and the same committee were authorized to complete the transfer of the lease in behalf of the company, and make such purchases as were recommended in the report. The committee reported verbally on the 12th of February, 1847, that they had concluded an arrangement with Mr. Knight for the possession of the property, to be delivered to the company on the first of the ensuing month.

The plaintiff offered in evidence, and the same was received and read, against the defendants' objection, the following written memorandum signed by M. H. Simpson, as the agent of the defendants: —

"Rent to be $6000 per annum, to commence from March 1st, 1847, in quarterly payments of $1500 each. Taxes to be at $150 or less. Machinery to be kept in repair, according to my agreement with the city. No additional steam power is expected, provided the water is not detained more than two months. It is understood that the city have the right to impede the water for two months, to build the dam. William H. Knight retains the upper loft in the barn, and the old grist mill for storage. All the stock to be taken at cost, say worsted at thirty-four cents, carpet-filling at twenty-three cents, and the double white at twenty-three cents. William H. Knight agrees, for the time of this lease, not to engage

directly or indirectly, in the manufacture of any such carpeting as he is now making. The New England Worsted Company to take possession on the 1st of March, and all carpets in the loom to be taken at the above estimate for the price of yarn, adding for scouring, coloring and weaving."

Parol evidence was introduced, on the part of the plaintiff: —

That on the 1st of March, 1847, two persons on the part of the plaintiff, with two others on the part of the defendants, commenced taking an account of the stock in the plaintiff's mills, and a schedule or inventory thereof, which was completed in a few days, in duplicate, (one of which was filed by the plaintiff as a bill of the particulars of his claim for goods sold and delivered,) and was examined by the defendants' superintendent, who found it correct, was sent to the defendants' agent or treasurer, about the 17th of said March: That the defendants, between the 1st and the 10th of March, took possession of the plaintiff's mills, and proceeded to do work in two of them, up to the 20th of the same March, when the mills, with some of the stock therein, were destroyed by fire: That one of the plaintiff's mills was shut up, and the key thereof taken, by order of Simpson: That the superintendent and workmen, who had been employed by the plaintiff in his mills, were employed by the defendants, after they took possession as aforesaid, and were paid by the defendants: That carpets were made by the defendants, at the plaintiff's mills, of the materials taken of him by them, to the amount of six or seven thousand dollars, and were sent by the defendants' teams to the railroad cars, to be carried to Boston, to a merchant there, who received them and paid the defendants therefor: That a large amount of wool, included in the aforesaid schedule or inventory, and which the plaintiff had purchased in Boston, but had not removed, was sent to the defendants, and was used by them in their lower factory.

It was also proved, by the plaintiff, that, on the 17th of April, 1847, a sale was made by Simpson, as agent of the defendants, of a lot of yarn from the carpet mills at Saxon

ville. The whole amount of the sale was $11,142·03, from which a deduction was made (on account of the yarn having been injured) of $364·70. The bills were made directly from Simpson, and not from him as agent.

The defendants moved the court as follows: — " It appearing from the plaintiff's case, and the introduction of the memorandum of an agreement, that goods were put into the possession of the defendants, subsequent to such entire agreement, it is incumbent on the plaintiff to prove performance, or a tender of performance, of such entire agreement, or a waiver and abandonment thereof and delivery on an independent and subsequent agreement; and as the plaintiff has furnished no such proof, the defendants move that the plaintiff be nonsuited, or that the court rule and instruct the jury that the plaintiff has not maintained his action." The court declined so to do, and subsequently instructed the jury, that the contract was divisible, and that, in rendering their verdict, they need not have reference to the lease, or to the real estate.

The defendants then called Moses H. Ripley, as a witness; and he testified that he was superintendent of the defendants' works; that he assisted in taking an account of the plaintiff's stock at the carpet mills; that a copy of the schedule or inventory thereof was delivered to him by the plaintiff's clerk, which he (the witness) compared with his own memorandum, and pronounced correct; that he did not agree to any indebtedness of the defendants to the plaintiff, as he had no authority so to do; but that he presumed it was correct, so far as it respected the weight, measures and computation; and that he sent a copy, so furnished, to Boston, to Simpson, or Reynolds, the defendants' treasurer.

The defendants also introduced their records, (the plaintiff objecting), from which it appeared, that on a claim made by the plaintiff of the defendants, the defendants took the opinion of counsel, and thereupon voted, that the treasurer be authorized to adjust and settle the plaintiff's claim against the company; deducting therefrom the amount charged for machinery, which had not been taken by the company; and de-

ducting also the amount of insurance held by the plaintiff from the Merchants Insurance Company, at the time of the loss by fire: That the plaintiff having addressed a note to the defendants demanding payment of his claim, amounting to $43,000, the president of the defendants was authorized to reply thereto, and did reply, that the defendants did not consider the company indebted to him to the extent of his claim, but that they were willing to submit to arbitration the amount they disputed, and to abide by the decision : That a negotiation, for an agreement to refer the matter in controversy between the parties, was thereupon entered into, which terminated in such an agreement, and that the president was authorized to sign the agreement with the plaintiff, for reference of the matters in dispute between them to arbitration.

The defendants then introduced and read in evidence a paper, signed by the plaintiff, and by Simpson, the agent of the defendants, and by Reynolds, their treasurer; which paper, the defendants stated, was prepared as a statement of facts, with a view to the reference agreed upon as above. This paper was as follows : —

"The following is a statement of the occurrences under which the manufacturing establishment of Mr. Knight was connected with the New England Worsted Company, previous to the fire which destroyed that establishment on the morning of the 20th inst. In the month of February last, M. H. Simpson and W. H. Knight had conversation in relation to the business of their respective establishments, especially, on the part of Simpson, in reference to the surplus production of carpet yarns, at his mill, beyond the demand of purchasers ; and, on the part of Knight, in reference to his willingness to give up the business of carpet manufacturing, if he could get rid of the lease which he held, from the city, of his mills, and of the stock of materials which he had on hand. From this conversation at different times resulted an agreement, as per the annexed memorandum of Mr. Knight, and from this memorandum a proper lease and a particular agreement were to have been entered into between the New

England Worsted Company and W. H. Knight as soon as
Mr. Knight.could obtain the requisite authority from the city
to underlet.    That authority has not yet been obtained,
although Mr. Knight has had assurances from the water
commissioners that it would be granted.    Mr. Knight gave
possession of the property to the New England Worsted Com-
pany on the 1st day of March.    On that day, the opera-
tives commenced to draw their pay from the New England
Worsted Company; but the materials, the operatives, and the
superintendent, all were the same, when the fire occurred, as
they would have been if the work had been continued by
Mr. Knight.    It would have taken some considerable longer
time for the materials of Mr. Knight to have been used up,
and before the materials of the New England Worsted Com-
pany could have been used in the looms.    Some two or three
days before the fire, the treasurer of the New 'England
Worsted Company saw Mr. Knight, and asked him respecting
the nature of the property to be transferred, especially as he
wished to get insurance, if the New England Worsted Com-
pany had any risk in it, on their own account.    Mr. Knight
stated to him that he had a policy of insurance on the prop-
erty for $10,000, which would amply cover the stock, and
which he would transfer to the company.    The treasurer of
the New England Worsted Company had not received an
invoice or bill of the property, previous to the fire, although
a bill had been handed to Mr. Simpson, on or about the
(blank) day of March.    The treasurer, under all these cir-
cumstances, considered that the New England Worsted Com-
pany could have no risk not covered by Mr. Knight's policy,
until the transfer of the lease from the city was made, and
some settlement, or arrangement for settlement, made, for the
materials taken, or to be taken, from Mr. Knight."

The plaintiff then called Joseph Balch, president of the
Merchants Insurance Company, who testified that the plain-
tiff was insured at his office, to the amount of about $11,000;
that Simpson and Reynolds came to him immediately after
the fire at Saxonville, to make a claim on behalf of the New

England Worsted Company; that he told them the office had no contract with that company; that they asked him if the office would not make them some allowance in some way; that he asked Simpson to state his claims in writing, with the facts in the case, and the witness would submit it to the directors; but that no such writing was ever brought to the office; that the witness had heard that Knight had sold most of the insured property; that Knight never made any claim on the office for the loss of this property; but that the office paid him about $1000 for property burned, which he had not sold, and the policy was then cancelled.

Henry H. Fuller, also called by the plaintiff, as a witness, testified as follows : — " The plaintiff and Simpson both called on me soon after the fire. They were at my office together and separately. Knight came very early after the fire. Simpson inquired of me, some days after the fire, whether Knight had seen me, and I said yes. He then said there was a loss, and he wished to have the insurance office pay the policy. He said it was necessary to have a statement of the case, in order to induce the insurance company to settle. I then told him that as Knight had sold to the Worsted Company, he could make no statement inconsistent with that fact. Simpson went off, and came again with Knight, and I was asked whether it would be safe for Knight to sign a statement which was then shown to me. I examined the statement, and told Knight it would be safe for him to sign it. I do not think the paper, just put into the case by the defendants, is the paper that was shown to me at that time. There are things in this which were not in that. I should not have advised Knight to sign this paper."

The defendants' counsel requested the court to instruct the jury as follows : —

1. The party affirming the sale must satisfy the jury that it was intended to be an absolute transfer, and all that remained to be done was merely for the purpose of ascertaining the price of the articles sold, at the rate agreed upon.

2. If the jury should be satisfied that the purchase of the lease

and the sale of the goods were one entire transaction, whereof the purchase of the lease was a substantial part, and that Knight had never given or tendered a lease, according to the agreement, the sale was not complete, and Knight could not maintain an action for any thing more than the goods actually sold by the defendants, if the form of action were appropriate thereto.

3. If the jury should be satisfied that the purchase of the lease and the sale of the goods were an entire transaction, whereof the purchase of the lease was a substantial part, and that Knight had never given or tendered a lease, according to the agreement, the sale was not complete, and Knight could not maintain an action for any thing more than the goods actually sold by the defendants, if the form of action were appropriate thereto, unless the defendants had waived the performance of that part of the agreement relating to the lease, and agreed to take and pay for the goods alone, without performance of that part of it, unless the defendants had waived its performance ; and that taking possession, and the other acts proved, were not sufficient to prove a waiver.

4. If, at the time of the fire, any thing of what had become the entire agreement of the parties remained to be done, either in drawing up a more particular agreement, or in settling upon the price or terms of payment, or in procuring the assent of the city of Boston to a transfer of the lease, or in the transferring of the policy of insurance, then the plaintiff could only recover, if the action were appropriate in form, for the goods actually sold by the defendants.

5. If, before the fire, any thing of the contract of sale still remaining unperformed, the parties met, and it was agreed and understood, that the sale was incomplete, and the title still in Knight, so that his policy of insurance thereon was still valid, and he thereon agreed to assign the same to the defendants, who thereupon neglected to procure insurance, it was evidence [from which the jury were bound to infer, and the plaintiff was estopped to deny, that the property still remained in him : if not so, it was evidence] from which it was compe-

tent for the jury to infer that the property remained in the plaintiff.

6. Upon the hypothesis in the motion last foregoing, if the plaintiff agreed to transfer the policy of insurance, he impliedly undertook that the same was then good, and this agreement and understanding became a substantial part of the entire contract, and to be performed accordingly.

7. The construction of the paper, signed by the plaintiff and Reynolds and Simpson, was to be made by the court, and it showed, that, down to two or three days before the fire, the property in the goods was still in the plaintiff, and his policy thereon still in force ; that the agreement to transfer the policy formed a part of the plaintiff's entire contract, to be performed before he could maintain his action.

The jury were instructed, that if the plaintiff was entitled to recover at all, it was only on the count for goods sold and delivered ; that the plaintiff must show a complete sale and delivery of the property, before the 20th of March, 1847, and that the burden of proof was upon him to satisfy the jury that it was intended and understood by the parties to be an absolute transfer, and that all which remained to be done was merely to ascertain the price of the articles sold, at the rate agreed upon :

That the paper introduced by the plaintiff was a divisible contract, and that the plaintiff could recover for whatever goods he actually sold and delivered to the defendants ; that if the property was absolutely transferred to the defendants, and all that remained to be done was to ascertain the amount, and measure, weight, &c., then it passed to the defendants, and this action could be maintained :

That it was immaterial whether the defendants had received a lease or not ; that if it was understood by the parties that the property in the goods passed and was absolutely transferred to the defendants, it only remaining to make out the schedule, then the plaintiff was entitled to recover, unless he defendants had made out some defence :

That the paper relied on by the defendants as an admission

24*

of facts by the plaintiff, would be considered by the jury, and they would judge, from the evidence respecting it, whether it was prepared with a view to a reference, as contended by the defendants, or with a view to an application to the Merchants Insurance Company, as suggested by the plaintiff: That the jury would also judge, from the evidence, whether this paper was obtained from the plaintiff by disingenuous means, or for any sinister purpose.

The jury were further instructed, as to this paper, that even if it imported all that was contended for by the defendants, it did not estop the plaintiff to say, that any admission which it contained was inadvertently erroneous; that if any thing therein admitted by the plaintiff was not true, he might so prove, unless he intended to deceive the defendants: That if the property had all been transferred, before the paper was signed, then the words "to be transferred," which are in the paper, would not affect the case; and that the jury would decide, upon the evidence, whether all the property had not been transferred before: That if the jury could reconcile all the facts, so as to remove imputations from all persons, it was their duty so to do: That the parties might have been in doubt as to their rights under the policy, and as to the legal ownership of the property; and that this fact might explain the whole; but that the fact, whether the property was transferred before the making of that paper, must be decided upon the whole evidence.

The jury were further instructed, that the policy of insurance did not affect the case, unless the plaintiff was guilty of fraud or misrepresentation respecting it, whereby the defendants' conduct was affected.

And the court declined to give the instructions prayed for by the defendants, in the form and to the extent prayed for. But the first prayer of the defendants was fully granted, as above appears. The fifth prayer was also granted, excluding only the words "from which the jury were bound to infer, and the plaintiff was estopped to deny, that the property still remained in him; if not so, it was evidence."

The jury returned a verdict for the plaintiff, for his whole demand, amounting to $43,443·76, and interest, on the count for goods sold and delivered, and for the defendants on the other counts.

If the aforesaid rulings and instructions, or any of them, were erroneous, or if any of the instructions prayed for by the defendants, and refused by the court, ought to have been given to the jury, the verdict is to be set aside, and a new trial granted ; otherwise, judgment is to be entered on the verdict.

*R. Choate* and *P. W. Chandler*, for the defendants.

*R. Fletcher* and *E. R. Hoar*, for the plaintiff.

SHAW, C. J. This is an action for goods sold and delivered, and the questions arising in it are the more important on account of the large amount of property involved. A circumstance, which renders the case the more complicated, and gives it the deeper interest, is, that a considerable part of the goods in controversy were destroyed by fire. If the property had then vested in the defendants, the risk and consequent loss were upon them ; otherwise, the risk and loss were the plaintiff's.

The plaintiff relied upon a written memorandum, signed by Simpson, the acknowledged agent of the defendants, which is set forth in full in the report. The execution is proved or admitted.

This memorandum is expressed in brief terms, but considered in the light thrown upon it by the surrounding circumstances, it is intelligible. In expounding a written contract, although parol evidence is not admissible to prove that other terms were agreed to, which are not expressed in the writing, or that the parties had other intentions than those to be inferred from it, yet it is competent to offer parol evidence to prove facts and circumstances, respecting the relations of the parties, the nature, quality, and condition of the real and personal property, which constitute the subject matter respecting which it is made. It is also competent to prove by parol evidence -- indeed, it can hardly be done by any other -- the

acts of the parties, at and subsequent to the date of the contract, as a means of showing their own understanding of its terms.

The parol evidence, first introduced by the plaintiff, is of this character. It tended to prove, that the plaintiff had mills at Saxonville, at which he manufactured carpets; that the defendants had mills below those of the plaintiff, where they manufactured yarns; that on the 1st of March, two persons, on the part of each of these parties, began taking an account of stock in the plaintiff's mills, and a schedule or inventory thereof, which was completed in a few days, was examined by the defendants' superintendent and found to be correct, and sent to the defendants' agent, before the fire took place. It further appears, that between the 1st and the 10th of March, the defendants took possession of the plaintiff's mills, worked in them, locked up one of them which was not in use, finished a large quantity of carpets with the stock in the mills, and sent the same to market to be sold on their own account; that from the time they so took possession, the superintendent and workmen, who had been employed and paid by the plaintiff, were employed and paid by the defendants; and that a large amount of wool and other stock, embraced in the inventory or schedule, was taken possession of by the defendants on their own account.

Here, it appears to us, the facts being satisfactorily proved, are all the elements *prima facie* of a complete sale and delivery of the stock, consisting of unfinished carpets in the loom, and of the yarn and wool. The stipulation was for the whole stock, described in general terms, at certain agreed rates; and when the account and inventory were completed, stating the quantities of each, and the agreed prices were applied, the amount of the whole purchase was ascertained; and this schedule, being sent to and accepted by the defendants' agents, was evidence upon that point. As to delivery, it is a familiar rule, that where there is a contract for the sale of personal property, delivery of the possession of the store or warehouse, where it is deposited, is a good delivery to com-

plete the contract and vest the property in the vendee. *Tarling* v. *Baxter*, 6 B. & Cr. 360. Besides, the fact, that the defendants took actual possession of the stock and disposed of a considerable part of it on their own account, is quite conclusive on the subject of delivery.

The defendants, however, took a different view of the subject; and, when the plaintiff's evidence was in, moved the court to order a nonsuit, or to instruct the jury, that the action could not be maintained. The grounds taken were, that the memorandum was one entire agreement; that the goods having been put into the possession of the defendants, subsequently to an entire agreement, it was incumbent on the plaintiff to prove performance, or a tender of performance, on nis part, of such entire agreement; or a waiver and abandonment thereof, and delivery on an independent and subsequent agreement. The court declined so to instruct the jury, but instructed them, that the contract was divisible, and that they need have no reference to the lease or to the real estate.

As we understand the argument, this objection divides itself into two distinct propositions : 1. That the plaintiff cannot recover, without setting out the entire agreement, and averring and proving performance or tender on his part : 2. That he cannot recover on a general count, as for goods sold and delivered, but must set out the acts done under it, and hence establish the obligation of the defendants to make payment.

I. In regard to the first, there is no doubt, that the contract was one entire contract, and it may be safely assumed, that the undertakings and stipulations, on the one side, may have been and were the motive and the consideration for the stipulations on the other side. So, where several different instruments are all executed at the same time, and bear the same date, and have a relation to each other, they are all said to be deemed in law to constitute one and the same transaction, — one entire contract, — and yet the legal effect is, to bind different parties to do different things, at different times. Thus, a contract may be one and entire in its origin ; and,

yet, looking to the performance of different things, at different times, it may be divisible in its operation.  This, then, leads to the great question, which has been much agitated in courts of law, and sometimes has been the subject of very subtile distinctions, that is to say, whether mutual stipulations are dependent, so that he who demands performance must show performance, or a tender or readiness to perform, on his part ; — or independent, so that the consideration of the stipulation on the one side is the mutual promise on the other, not requiring an actual performance or tender, but where the remedy upon both sides is by action.  This question depends upon the intention of the parties, and the nature of the respective stipulations, and is to be determined rather from the sense of the whole taken together, than upon any particular form of expression.  If a party promise to build a house upon the land of another, and to dig a well on the premises, and to place a pump in it ; and the owner of the land covenants seasonably to supply all materials, and furnish a pump ; it is very clear, that the stipulation to furnish materials is dependent and constitutes a condition, because the builder cannot perform on his part, until he has the materials.  So to put a pump into the well.  But the stipulation to dig a well is not conditional, because it goes to a small part only of the consideration, and does not necessarily depend on a prior performance, on the part of the owner, and because a failure can be compensated in damages, and the remedy of the owner is by an action on the contract.  The rule was laid down by lord Mansfield, in the case of *Boone* v. *Eyre*, 2 W. Bl. 1312, cited in 1 H. Bl. 273, in a note.  It is this : Where mutual covenants go to the whole consideration on both sides, they are dependent covenants, the one precedent to the other.  But where they go only to a part, and a breach may be paid for in damages, there the defendant has a remedy on his covenant, and shall not plead it as a condition precedent.  This rule has been restated and affirmed, with slight variations adapting it to particular circumstances, in a great number of cases, both in England and in this country.  *Duke of St. Albans* v.

*Shore*, 1 H. Bl. 270; *Campbell* v. *Jones*, 6 T. R. 570; *Havelock* v. *Geddes*, 10 East, 555, 564; *Glazebrook* v. *Woodrow*, 8 T. R. 366; *Storer* v. *Gordon*, 3 M. & S. 308. See also *Kingston* v. *Preston*, cited in *Jones* v. *Barkley*, 2 Dougl. 684, 689. These principles have been fully recognized and adopted in this commonwealth. *Hopkins* v. *Young*, 11 Mass. 302; *Tileston* v. *Newell*, 13 Mass. 406. Where several different instruments are executed at one time, and have relation to each other, they shall be construed together as one contract. *Makepeace* v. *Harvard College*, 10 Pick. 298; *Sibley* v. *Holden*, 10 Pick. 249. The question, whether covenants are dependent or independent, depends upon the intentions of the parties, and the nature of the acts to be performed. *Howland* v. *Leach*, 11 Pick. 151. Some of the stipulations in an entire contract may be dependent, and others independent, according to their nature and the order of performance. *Couch* v. *Ingersoll*, 2 Pick. 292; *Kane* v. *Hood*, 13 Pick. 281. The same rules of construction apply to a simple contract as to a contract under seal. *Kane* v. *Hood*, above cited.

The next point to be considered, being a subdivision of the first question, is, whether, according to the rules of law, thus stated, the stipulation on the part of the defendants, to purchase and pay for the estate in question, was a mutual and dependent stipulation, or an independent one. Taking this memorandum of agreement, in connection with the facts and circumstances, proved by evidence *aliunde*, it was a stipulation on the part of the company, to hire the plaintiff's mills, which he held under the city; the stipulation on the part of the plaintiff, that he would not engage in the carpet manufacture, during the term of this lease, indicates, that it was to be hired for some term of time; the stipulation that the rent should commence from the 1st of March, and the stipulation, on the part of the defendants, that they would take possession at that time, indicate clearly when the operation of the contract was to commence. Supposing the first act to be done, namely, the taking possession by the defendants, coupled with an implied stipulation on the part of the plain-

tiff, to give them possession, were mutual and dependent contracts; they were respectively performed by the parties. The one gave and the other took possession on the 1st of March. The next step was to be taken on the part of the defendants. They were to take and pay for all the stock at prices agreed. When there is an agreement to purchase a designated quality of goods at agreed prices, and nothing remains but to measure, weigh, count, or otherwise ascertain the quantity; when such weighing or measuring is done, either in the manner agreed upon in the contract, or in any other manner, by the assent and agreement of the parties, the price becomes due on delivery, unless there be some agreement for credit. *Riddle* v. *Varnum*, 20 Pick. 280; *Macomber* v. *Parker*, 13 Pick. 175. By necessary implication of law, in the absence of any stipulation, the price becomes forthwith payable. That they should be so measured and the price ascertained, at or *even after the defendants should take possession*, would be the ordinary presumption from the fact of the defendants' taking possession of the leased premises, and of the stock in them at the same time; and also from the fact, that the stock was so measured by agents mutually appointed, and the result thereof communicated to the agents of the company, without objection.

Here, then, was a stipulation on the part of the defendants, the legal effect and import of which were, that they would take and pay for certain goods, before any other act of performance could be done on the part of the plaintiff; of course, this stipulation was independent of any such performance to be done or averred. If the plaintiff should engage in the manufacture of carpets, it was independent of this stipulation to purchase. If he was under an implied obligation to the defendants for quiet enjoyment, this obligation could not be broken till their possession should be interrupted. The defendants had entered as the tenants of the plaintiff, and were never interrupted in the peaceable possession of the mills, till the mills were burnt. We are therefore of opinion, that whatever was the character of some of the stipulations of this

contract, the contract to purchase and pay for the goods on delivery was distinct and independent.

II. The next ground taken was, that even if this stipulation in the contract was independent, it was yet part of one entire contract, and that the plaintiff could not recover on a count in *indebitatus assumpsit* for goods sold and delivered, but should have set out the special contract, and have alleged the existence of such facts as would render the defendants liable.

The general rule is, that notwithstanding goods have been sold under a special agreement, yet if the agreement has been executed, and all the terms and conditions complied with, it has ceased to be executory, and has resulted in a debt, or duty to pay money, and therefore the vendor may recover thereon, in a count in *indebitatus assumpsit.* If the facts are not such as to prove that the defendant is indebted for the goods, then the contract is executory, and the plaintiff must set it out specially and truly, with the terms and conditions, and allege performance on his part. *Felton* v. *Dickinson,* 10 Mass. 287 ; *Baker* v. *Corey,* 19 Pick. 496.

Nor are we aware of any difference between the case, where the contract for the sale of goods is single and disconnected with other stipulations, and where it is a separate and independent stipulation, embraced in the same contract with other stipulations, on either or both sides. The principle is the same ; that which was an executory undertaking, has been executed and become a debt alike in both cases. And it appears to us, that the case is not without authority. *Mayfield* v. *Wadsley,* 3 B. & Cr. 357. Where an outgoing tenant had agreed with an incoming tenant, to take the crop of wheat growing on forty acres, at a fixed price, and also to purchase certain dead stock and a machine on the farm, at a valuation of a third person, which valuation was made accordingly, there was some difference of opinion among the judges, whether the plaintiff could recover in *indebitatus assumpsit* for the growing crops, on the ground, that being part of the realty, the contract in relation thereto was contrary to the

statute of frauds, but a majority of the court held, that he could recover for the whole, and all the judges agreed, that for the dead stock, which was to be taken at a valuation, *indebitatus assumpsit* would lie.   See also *Stone* v. *Rogers*, 2 Mees. & Wels. 443.

The true rule seems to be, as laid down in a recent case in this commonwealth, that if one contracts to do several things, at several times, an action of assumpsit will lie on each default ; for, although the agreement is entire, the performance is several, and the contract divisible in its nature.   *Badger* v. *Titcomb*, 15 Pick. 409.   In this case, Mr. Justice Wilde traces back the rules of the common law upon this subject to an ancient period, when it was held, that but one action of debt would lie upon one contract ; and points out the distinction between the actions of debt and of assumpsit, the latter of which, in form and theory, is an action on tort, claiming damages for the violation of a promise ; and he cites the authorities, on which the law has now finally settled down upon the more reasonable and equitable principle, that for each separate and distinct breach of a contract to do several things, an action will lie.   And it appears, that this distinction between debt and assumpsit is not now regarded in England.   By a recent English case, very like the present, it was held, that debt would lie for goods sold and delivered, on a separate and independent stipulation, to purchase and pay for goods, contained among several other mutual stipulations, in an agreement for a lease.   *Stone* v. *Rogers*, 2 Mees. & Wels. 443.

The court are therefore of opinion, that the direction of the judge was right, in refusing to order a nonsuit when the plaintiff rested his case, and in instructing the jury, that the contract was divisible, so far as performance and the right to recover for non-performance were concerned ; and that the jury need have no reference to the lease or to the real estate, nothing being to be done by the plaintiff respecting them, as a condition precedent to his right to maintain this action for the breach assigned.

III.  Supposing the plaintiff had thus far made out a *prima facie* case, it becomes necessary to examine the residue of this report, to ascertain how far the case was legally changed by the evidence offered in defence.  The defendants gave in evidence a paper signed by the plaintiff, and by the agent and treasurer of the defendants.

This paper is not dated.  It was offered as an agreed statement of facts entered into with a view to a reference in September, 1847.  There is nothing in the paper itself, indicating that it was prepared for this purpose, and we can perceive nothing in the records of the company, leading to a conclusion, that any such paper was prepared for such a purpose.  On the contrary, from the internal evidence, which the paper itself affords, and from the testimony of Mr. Balch and Mr. Fuller, it seems more probable that it was made soon after the fire, for the purpose of being laid before the Merchants Insurance Company, under a belief, that the parties, one or the other of them, could avail themselves of the insurance, which the plaintiff had at that office.  The paper would naturally be drawn up, if that were the object of it, in such a manner as to favor as much as possible the claim upon the insurance company.  The court are of opinion, that this was not intended to alter or vary the rights of the parties, as established by the prior instrument, but is at most an admission by the plaintiff of what he understood his rights to be.  If he supposed that his policy still covered the property, because it was the same property, in the same place, and that the policy would cover it, though the legal ownership had changed, this was a mistaken legal inference, and did not amount to the admission of any fact, contrary to his present claim.  His offer to transfer the policy to the company implies that he did not consider the loss his, and of course did not consider the property his.

The other point, on which this paper is supposed to be material, is, that there was an agreement, as appeared from the annexed memorandum, of the plaintiff, and that from this memorandum a proper lease and a particular agreement were

to be made, as soon as the plaintiff could obtain the requisite authority from the city to underlet.

Upon this part of the paper, it may be remarked, that it indicates, that there was a memorandum signed by the plaintiff, to the company, containing the stipulations on his part to the company, and of course it is a different memorandum from that first above recited, which is one containing the stipulations of the company to him. No such writing from the plaintiff to the company has been produced, and therefore it is not to be presumed, that it contained any other stipulations than those to be inferred from the writing which is produced and recited. There being no intimation, in the memorandum before us, that any written lease or extended agreement should be made by the plaintiff, the paper can amount to nothing more than this, that there was an understanding by the parties, not introduced into the memorandum, that such lease should be made.

The first remark is, that not being introduced into the memorandum, it could not be given in evidence to control, or alter, or add a new stipulation to, the written agreement; and, secondly, if it were so, if the defendants voluntarily entered into the premises without it, and held them without interruption or disturbance, till the fire, the making of such written lease was not a condition precedent, necessary to be performed by the plaintiff, before he could claim payment for the goods.

But, thirdly, the memorandum itself constituted a present demise, and as such operated to invest the defendants with the character of tenants, even though it was intended and expected that a more formal lease should be given. *Chapman* v. *Black*, 4 Bing. N. C. 187.

The paper goes further and states, and this must be regarded as evidence of the admission of the plaintiff, that under all the circumstances, the treasurer of the defendants considered that they could have no risk not covered by the plaintiff's policy, until the transfer of the lease from the city, and some settlement, or arrangement for settlement, made, for the materials taken or to be taken from the plaintiff.

It would rather seem, from the first clause in this paper, and from the fact appearing in their records, that they were to pay a different rent to the plaintiff from that which he was to pay the city, and that the intention and expectation of the parties was, that he was not to assign and transfer the lease which he held of the city, but to underlet to the company. But considered either way, it was an admission of the plaintiff, as to what the treasurer considered to be the relative rights of the parties, respecting the policy of insurance.

Upon this paper, and the whole evidence, the defendants' counsel requested sundry instructions to the jury, as set forth at length in the report.

The first instruction prayed for was adopted, and the instruction given accordingly.

The second instruction could not be legally given, for the reason already stated, that by the terms of the written contract, the giving of a written lease, even if stipulated for, was not a condition precedent, if the defendants had entered and taken possession, under the agreement, without such written lease.

The third instruction could not be legally given, and would have been erroneous, for the reasons already stated.

As to the fourth instruction prayed for, the court did instruct the jury, that if any thing respecting the sale and purchase of the estate remained to be done, to ascertain the price and terms, the transfer was not complete, and the plaintiff could not recover for goods sold and delivered. This was all which properly could be given under this prayer.

The fifth is a complicated prayer for instructions, assuming some facts, not proved, and requiring the court to instruct the jury, authoritatively, upon the effect of evidence, which the court was not bound to do. The evidence, as such, was left to the jury with proper instructions.

The sixth instruction prayed for is disposed of by the preceding. The inferences proposed to be drawn were inferences of fact, and as such properly left to the jury on the evidence.

25 *

The construction of the paper, which was the subject of the seventh prayer for instructions, was rightly left to the jury.   They were instructed, that this paper relied on by the defendants, as an admission of facts by the plaintiff, should be considered by them, and that they should judge from the evidence respecting it, whether it was prepared with a view to a reference, as contended by the defendants, or with a view to an application to the Merchants Insurance Company's office, as suggested by the plaintiff.   They would also judge from the  evidence, whether this paper was obtained from the plaintiff by disingenuous means or for any sinister purpose.

The court are of opinion, that the further instruction as to this paper, and the other instructions given by the judge, were correct ; that the prayers for instruction made  by the defendants, so far as they were  not granted, were rightly withheld ; and that there is no ground to set aside the verdict.

*Judgment on the verdict.*